**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CUBAN ELECTRIC COMPANY A/K/A COMPAÑIA CUBANA DE ELECTRICIDAD<br>P.O. Box 5023<br>Boca Raton, FL 33431<br><br>*Plaintiff*,<br><br>v.<br><br>UNIÓN ELÉCTRICA<br>Edificio del Ministerio de Energía y Minas<br>Avenida Salvador Allende No 666 e/ Oquendo y Soledad<br>Municipio Centro Habana, La Habana, Cuba<br><br>AND<br><br>ENERGAS S.A.<br>Edificio del Ministerio de Energía y Minas<br>Avenida Salvador Allende No 666 e/ Oquendo y Soledad<br>Municipio Centro Habana, La Habana, Cuba<br><br>*Defendants*. | Case No. |

**COMPLAINT**

For its Complaint in this Helms-Burton action, Plaintiff Cuban Electric Company a/k/a Compañia Cubana de Electricidad ("CEC" or "Plaintiff") states as follows:

**NATURE OF ACTION**

1. Plaintiff brings this Complaint against Defendants Unión Eléctrica ("UNE") and Energas S.A. ("Energas" and, together with UNE, "Defendants"), both Cuban agencies or instrumentalities, for unlawful trafficking in Plaintiff's confiscated property in violation of Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 (the "Act" or the "Helms-Burton Act"), codified at 22 U.S.C. §§ 6081–6085.

2. Before 1960, Plaintiff owned and operated a substantial portion of Cuba's electric power generation and transmission infrastructure, supplying more than 90% of Cuba's electricity. In 1960, Fidel Castro's revolutionary regime unlawfully confiscated that property and numerous other assets—collectively valued in excess of $300 million—from Plaintiff without just cause or compensation. As a direct result of these confiscations, Plaintiff was stripped of its investments, deprived of the use and value of its property, and forced to cease its operations in Cuba.

3. In 1970, the Foreign Claims Settlement Commission ("FCSC"), which Congress established as a quasi-judicial, independent agency within the U.S. Department of Justice to adjudicate claims of U.S. nationals against foreign governments for expropriation and other issues, certified the value of Plaintiff's confiscated property at $267,568,413.62, plus 6% interest from August 6, 1960 to the date of settlement. *See* FCSC Decision No. CU-4122 regarding Claim No. CU-2578 (Aug. 19, 1970), which is incorporated by reference herein and attached as **Exhibit 1**.

4. For more than sixty years, Cuban agencies and instrumentalities, in concert with and including others, have knowingly and intentionally trafficked in, exploited, and derived substantial commercial benefit from Plaintiff's confiscated property without authorization from, or compensation to, Plaintiff. The power plants, transmission facilities, service centers, gas infrastructure, and electrical networks, as well as other assets and equipment confiscated from Plaintiff, remain embedded in Cuba's state-owned electric power system and continue to generate revenue and other benefits for Defendants at Plaintiff's expense.

5. UNE, Cuba's state-owned electric utility, is a principal beneficiary of the confiscation. UNE owns, controls, manages, operates, and profits from numerous confiscated

assets, including major generation facilities built on or occupying Plaintiff's facilities, such as the Antonio Maceo ("Renté") Thermoelectric Power Plant in Santiago, the Carlos Manuel de Céspedes Thermoelectric Power Plant in Cienfuegos, the Melones electrical substation and gas complex on Havana Bay, and the Guaso Hydroelectric Station. UNE also relies on substantial portions of CEC's transmission and distribution network that now form the backbone of Cuba's national electric grid and Havana's natural gas grid. In addition to its use and operation of these and other assets, UNE also exploits the confiscated property by offering foreign investment into joint ventures, like Energas. *See* 22 U.S.C. § 6081(5).

6. Energas likewise profits from and traffics in Plaintiff's confiscated property through its participation in Cuba's power-generation and natural gas processing sectors. Energas' power-generation and gas-processing operations depend upon and are physically integrated with facilities, transmission infrastructure, and gas-distribution assets confiscated from CEC. Working in conjunction with UNE and other Cuban state entities, Energas relies on and derives commercial benefit from electrical generation, transmission, fuel supply, and industrial infrastructure built on, connected to, or integrated with Plaintiff's confiscated assets, including facilities associated with Plaintiff's former Cienfuegos Steam Electric Station and the broader national electric system that Plaintiff developed and operated prior to confiscation.

7. Defendants are thus knowingly and intentionally trafficking in Plaintiff's confiscated property without authorization. Defendants have trafficked in the confiscated property by owning, controlling, managing, operating, using, and commercially exploiting Plaintiff's former electric-generation, transmission, and gas-distribution assets. Defendants further have engaged in commercial activity using and benefiting from the confiscated property and have profited from the trafficking activities described throughout this Complaint.

8. Title III of the Act, 22 U.S.C. §§ 6081–6085, authorizes Plaintiff to bring this action to deny Defendants "any profits from economically exploiting Castro's wrongful seizures." 22 U.S.C. § 6081(11). In addition, because the FCSC certified Plaintiff's losses (the "FCSC Certified Claim"), Plaintiff is entitled to a presumption of ownership of the confiscated property at issue here, a presumption that the amount of the FCSC Certified Claim ($267,568,413.62, plus 6% interest from August 6, 1960 to the date of settlement) is the proper measure of damages, and an award of treble damages as provided by the Act.

## JURISDICTION AND VENUE

9. Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically Title III of the Helms-Burton Act, codified at 22 U.S.C. §§ 6021–6091. *See Exxon Mobil Corp. v. Corporación CIMEX S.A. (Cuba)*, 146 S. Ct. 1909, 1920–21, 609 U.S. __ (2026) (establishing suits under the Helms-Burton Act proceed under 28 U.S.C. § 1331 and holding that Cuban agencies and instrumentalities are not immune from jurisdiction of the courts of the United States for claims arising under the Helms-Burton Act); 22 U.S.C. §§ 6023(11), 6082.

10. Pursuant to Fed. Rule Civ. P. 4(k)(1)(C), personal jurisdiction over the Defendants exists as a matter of law because Congress has authorized service on the Defendants by federal statute, pursuant to 22 U.S.C. § 6082. *See Exxon*, 146 S. Ct. at 1920–21. Defendants will be served in a manner consistent with that provision.

11. Because this claim arises under federal law, personal jurisdiction is established under Fed. Rule Civ. P. 4(k)(2) by service of a summons or filing a waiver of service as long as "(A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and

(B) exercising jurisdiction is consistent with the United States Constitution and laws." Fed. Rule Civ. P. 4(k)(2).

12. Defendants are not subject to jurisdiction in any state's court of general jurisdiction.

13. Moreover, as explained in *Fuld v. Palestine Liberation Org*., 606 U.S. 1 (2025), Rules 4(k)(1) and 4(k)(2) are adequate to support personal jurisdiction so long as jurisdiction comports with the Fifth Amendment's notion of due process. Fifth Amendment due process is met where, as here, Congress has enacted legislation that directly implicate important federal policies aimed at protecting American citizens abroad. *Id*. at 19-20. Exercise of personal jurisdiction over Defendants is also reasonable. Defendants' unlawful trafficking, as set forth herein, is directed at the United States. The harm Defendants have caused and continue to cause is occurring in the United States to Plaintiff, a United States national and a Florida entity.

14. Alternatively, Defendants are not entitled to Fifth Amendment due-process protections because they are alter egos of the Cuban state under *Bancec* and its progeny. According to *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba ("Bancec")*, 462 U.S. 611 (1983), and *Helmerich & Payne Int'l Drilling Co. v. Venezuela*, 153 F.4th 1316 (D.C. Cir. 2025), factors bearing on state control include: (1) economic control; (2) entitlement to profits; (3) role of government officials; (4) whether the state is the real beneficiary; and (5) whether recognizing separate corporate identities would permit the foreign state to obtain benefits while avoiding its obligations. *See Archirodon Constr. (Overseas) Co. Ltd. v. Gen. Co. for Ports of Iraq*, No. 22-cv-1571, 2024 WL 3844800, at *4 (D.D.C. Aug. 16, 2024). As demonstrated further below, Defendants are alter egos of the Cuban state because the Cuban government exercises extensive control over both Defendants.

15. Alternatively, pursuant to 28 U.S.C. § 1330(b) and consistent with the United States Constitution and laws, personal jurisdiction over the Defendants exists as to every claim for relief over which this Court has jurisdiction under 28 U.S.C. § 1330(a) due to Defendants' contacts with this District and with the United States as a whole as a result of their unlawful trafficking activities and their commercial activities, causing harm to Plaintiff, a United States national and a Florida entity, which are explained in detail below.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4).

17. The amount in controversy exceeds $50,000 as required by 22 U.S.C. § 6082(b).

18. Contemporaneously with the filing of this Complaint, Plaintiff will pay the special fee for an action under Title III of the Helms-Burton Act, which is $7,202 pursuant to the fee schedule adopted by the Judicial Conference in December 2023.

## PARTIES

19. Plaintiff Cuban Electric Company is a U.S. national and a corporation organized and existing under the laws of the state of Florida since 1927, with its principal place of business at 6600 North Military Trail, Boca Raton, Florida, 33496. Plaintiff is also known as Compañia Cubana de Electricidad and is the recipient and owner of the certified claim attached as Exhibit 1.

20. Defendant Unión Eléctrica is an enterprise organized under the laws of Cuba and is owned directly by Cuba, which is a foreign state. UNE serves as the Cuban state monopoly for power generation, guaranteeing "the generation, transmission and distribution of electricity throughout the national territory" and its commitment to "the Revolution, the Party, the Organization and to all our people." There is no private electricity market in Cuba—UNE is the "sole provider" of electricity in Cuba. UNE's principal place of business is in Cuba, at the

Edificio del Minesterio de Energía y Minas, Avenida Salvador Allende No 666 e/ Oquendo y Soledad, Municipio Centro Habana, Cuba.

21. Defendant Energas S.A. is an enterprise organized under the laws of Cuba as a joint venture with three equal owners: 1/3 owner UNE, 1/3 owner Unión Cubapetróleo ("CUPET"), Cuba's state-owned oil company, and 1/3 owner Sherritt International Corporation ("Sherritt"), a minerals company which is a corporation organized under the laws of Canada with its principal place of business in Canada. Thus, Energas is majority-owned by Cuban state-owned entities. Energas processes raw natural gas, which is supplied to Energas free of charge by CUPET. Energas also generates electricity for sale to the national grid, providing approximately 10% of Cuba's total electrical generating capacity. Energas' principal place of business is in Cuba, and it has operations throughout the country.

22. As discussed below, both UNE and CUPET are agencies or instrumentalities of the Cuban state and, while they are legally distinct entities, are each totally controlled and dominated by the government of Cuba, over and above the normal supervisory control exercised by a parent over a subsidiary. Given UNE and CUPET's ownership of Energas, Energas is itself an agency or instrumentality of the Cuban state that is totally controlled and dominated by the government of Cuba, over and above the normal supervisory control exercised by a parent over a subsidiary.

## BACKGROUND

23. CEC was founded in 1927 in Tallahassee, Florida.

24. In 1928, CEC acquired the properties of small utility companies in Cuba. CEC expanded its services throughout the 1950s, spending nearly $190,000,000 on construction of additional facilities and improvements.

25. In three decades, CEC more than doubled Cuba's power generation capacity, growing it from 161.5 MW to 430 MW. By 1960, CEC generated more than 90% of the electricity sold in Cuba while also furnishing manufactured gas in Havana.

## I. Expropriation by the Cuban Government

26. Cuba issued Resolution No. 1 on August 6, 1960 pursuant to Cuba's Law 851, which listed the CUBAN ELECTRIC COMPANY (Compañia Cubana de Electricidad) as nationalized.

27. As detailed below, the Cuban Government expropriated numerous assets from CEC in violation of international law, including but not limited to:

a) Twelve named electric stations,

b) 6,619 miles of power lines,

c) The Havana gas system,

d) A service station in Capdevila which contained the general offices of CEC, and

e) Other assets including current assets, debits, and intangible assets set forth in the FCSC Certified Claim.

28. On August 6, 1960, 95.8% of the shares of CEC were held by U.S. nationals or residents.

29. The assets confiscated from CEC on August 6, 1960 and described in the FCSC Certified Claim are hereinafter referred to as the "Confiscated Property."

30. Cuba has never paid, and Plaintiff has never received, compensation for the expropriation of the Confiscated Property.

## II. The Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996

31. On March 12, 1996, President Clinton signed into law the LIBERTAD Act of 1996 (also known as the "Helms-Burton Act" and referred to herein as the "Act"), codified at

22 U.S.C. §§ 6021–6091. Title III of the Act (codified at 22 U.S.C. §§ 6081–6085) provides a right of action to U.S. nationals, like Plaintiff, who owned property in Cuba that was confiscated on or after January 1, 1959.

32. Title III authorizes the President to suspend the right of action for sequential periods of up to six months. On July 16, 1996, President Clinton notified Congress that he would be allowing the Act to go into effect on August 1, 1996, but that he would suspend the right of action under Title III for six months. Since that decision, every President (or Secretary of State) issued a sequential six-month suspension of the right of action until 2019.

33. On April 17, 2019, Secretary of State Pompeo announced that Title III would go into full effect, including the right of action, as of May 2, 2019.

34. Section 302 of the Act provides the following civil remedy:

> (1) Liability for trafficking.--(A) Except as otherwise provided in this section, any person that, after the end of the 3-month period beginning on the effective date of this subchapter, traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages . . . 22 U.S.C. § 6082(a)(1).

35. Under the Act, the definition of a "person" who may be liable for trafficking expressly includes "any person or entity, including any agency or instrumentality of a foreign state" as defined by the Foreign Sovereign Immunities Act, 28 U.S.C. § 1603(b). *See* 22 U.S.C. §§ 6023(1), (11).

36. The term "trafficking" is construed broadly. A person is liable for trafficking in confiscated property under the Act if that person, without authorization from the rightful owner, knowingly and intentionally—

i. sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses,

> obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,
>
> ii. engages in a commercial activity using or otherwise benefiting from confiscated property, or
>
> iii. causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person, without the authorization of any United States national who holds a claim to the property.

22 U.S.C. § 6023(13).

37. Because Plaintiff has never authorized any person to engage in the activities covered by the Act's definition of trafficking with respect to the Confiscated Property, Section 302 provides Plaintiff with a private right of action against any person—including Cuba's state-owned enterprises—that has trafficked in the Confiscated Property.

## III. The Act's Presumption in Favor of Certified Claims

38. Section 302(d) of the Act mandates a presumption in favor of the Plaintiff's certified claims, noting "There **shall be a presumption** that the amount for which a person is liable . . . is the amount that is certified" by the FCSC under the International Claims Settlement Act of 1949. 22 U.S.C. § 6082(a)(2) (emphasis added).

39. Moreover, under Section 303(a)(1), "the court shall accept as **conclusive proof of ownership** of an interest in property a certification of a claim to ownership of that interest that has been made by the" FCSC under Title V of the International Claims Settlement Act of 1949. 22 U.S.C. § 6083(a)(1) (emphasis added).

40. Under Section 302(a)(3) of the Act, "[a]ny person that traffics in confiscated property for which liability is incurred" shall be liable for treble damages if a U.S. national owns a certified claim to that property. 22 U.S.C. §§ 6082(a)(3)(A), (3)(C).

41. The preferential treatment afforded to certified claims reflects Congress' clear deference to the experience and expertise of the FCSC in investigating and adjudicating losses overseas. The Conference Report from the Committee of Conference states that "courts shall give a strong presumption to the findings of the FCSC." The Conference report continued:

> The committee of conference recognizes the importance of a decision by the Foreign Claims Settlement Commission in certifying a claim and, accordingly, believes that no court should dismiss a certification in an action brought under [Title III]. The committee of conference also notes the recognized special expertise of the FCSC in determining the amount and validity of claims to confiscated properties overseas. H.R. Rep. 104-468, at 63 (1996).

42. Accordingly, because Plaintiff's claim was certified by the FCSC Plaintiff is entitled to (i) a presumption of accuracy with regard to the amount of the claim; (ii) to have the claim be treated as conclusive proof with regard to Plaintiff's ownership of the Confiscated Property; and (3) a judgment on the claim that includes treble damages.

## IV. The Certification of Plaintiff's Claim by the Foreign Claims Settlement Commission

43. In response to the expropriation of the Confiscated Property, CEC filed a claim with the FCSC pursuant to Title V of the International Claims Settlement Act of 1949, which gives the FCSC jurisdiction over expropriation claims of U.S. nationals against the Government of Cuba.

44. Pursuant to 22 U.S.C. § 1643b(a), the FCSC "shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba . . . for losses resulting from the nationalization, expropriation, intervention, or other taking of . . . property

including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States."

45. Pursuant to 22 U.S.C. § 1643a(3), "property" is defined as "any property, right, or interest, including any leasehold interest, and debts owed by the Government of Cuba . . . or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba . . . and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba . . ."

46. As required by the International Claims Settlement Act, the FCSC determined the validity and amount of CEC's claim and the value of the expropriated properties, rights, or interests by the valuation most appropriate to the Confiscated Property. The claim encompasses all of the Confiscated Property for which Plaintiff seeks damages here.

47. After reviewing CEC's ownership, the FCSC found that CEC qualified as a U.S. national within the meaning of the International Claims Settlement Act. *See* Ex. 1 at 2.

48. The FCSC then evaluated CEC's property claim, reviewing a wide range of evidence including CEC's Annual Report for the year ending in December 31, 1959; a Financial Report with a balance sheet for February 29, 1960; copies of records concerning inventories of equipment purchases, sales, investments and supplies; and affidavits of former CEC employees and found that CEC sustained a loss under the Act. Ex. 1 at 4.

49. The FCSC originally certified, on October 21, 1969, that CEC suffered a loss in the amount of $266,513,667.40. Ex. 1 at 10. After CEC filed objections to the denial of certain portions of the claim, the FCSC subsequently issued a final decision on August 19, 1970, adding $1,054,746.22 for the loss of equipment and supplies and certifying that CEC suffered a loss of $267,568,413.62 as a result of the Cuban government's expropriation of the Confiscated

Property. The FCSC further awarded interest on this amount at the rate of 6% per annum from the date of loss to the date of settlement. Ex. 1 at 14.

50. The certified loss breaks down as follows:

| **Asset Category (as certified)** | **Certified Value** |
|---|---|
| Utility Plant | $285,266,482.00 |
| Intangibles / investments in Cuba | $1,492,130.95 |
| Current assets | $30,244,140.00 |
| Deferred debits | $2,364,413.00 |
| Loss on equipment and supplies | $1,054,746.22 |
| *Less: set-offs* | *($52,853,498.55)* |
| **Certified loss (excluding awarded 6% interest)** | **$267,568,413.62** |

51. The various asset categories are explained in more detail below. Plaintiff has never settled the outstanding certified claims or received any payment from any entity with respect to the principal or interest due on its certified claim.

## V. Cuba Controls Defendants

52. The control that the Cuban government exercises over Defendants is extensive and exceeds the normal supervisory control exercised by a parent over a subsidiary.

53. UNE was first created in 1977. In 1988, UNE was merged with the Transmission and Distribution Union through Resolution 2079, issued by the Minister of the Cuban Ministerio de la Industria Básica (Ministry of Basic Industry), to create the entity that exists today.

54. UNE is one of a prominent group of Cuban entities called Organizaciónes Superiores de Dirección Empresarial ("OSDEs"). Pursuant to Decree 336 of 2017, the Cuban Council of Ministers creates OSDEs as subordinated entities to the Cuban government. The Cuban Council of Ministers determines the organizational structure of OSDEs, including making decisions regarding mergers, acquisitions, and liquidations. Under Cuban law, OSDEs are considered national entities for all relevant purposes.

55. The President of the Council of Ministers appoints the President or General Director of UNE and other OSDEs. The Council of Ministers appoints a Vice President of its body or a Minister to exercise controlling functions over UNE and other OSDEs, including the following:

a) Evaluating UNE's socio-economic results;

b) Controlling UNE's investment process and development programs;

c) Controlling UNE's implementation of the Cuban government's applicable Economic and Social Policy Guidelines;

d) Controlling UNE's compliance with Cuban regulations on the transfer of technology to and from abroad;

e) Controlling the economic effects in Cuba caused by UNE's subsidiaries, including foreign trade operations;

f) Controlling and monitoring UNE's application of foreign investment and collaboration policy;

g) Evaluating the President or Director General of UNE and approving his work plan; and

h) Fulfilling any other purpose assigned by the Council of Ministers or provided by Cuban law.

56. UNE is thus controlled by Cuba's Ministry of Energy and Mines and is subordinated to the Council of Ministers, Cuba's highest executive and administrative body.

57. On its website, UNE lists its office as the Building of the Ministry of Energy and Mines.

58. UNE is, thus, totally controlled and dominated by the Cuban state government and operated for the benefit of the Cuban government.

59. CUPET was established on March 25, 1992 by Resolution No. 23/1992, issued by the Cuban Ministry of Basic Industry. As provided for in that Resolution, Unión del Petróleo and Unión del Combustible were merged to form CUPET, which "for all legal purposes, is a

continuation of Unión del Petróleo and Unión del Combustible and is subrogated to their place and status."

60. Like UNE, CUPET is also an OSDE. Thus, the Cuban Council of Ministers also is involved in appointing CUPET's leadership.

61. The Cuban Ministry of Energy and Mines, as designated by the Cuban Council of Ministers, is responsible for the following controlling functions over CUPET among others:

a) Approving short and mid-term plans, submitted by CUPET, ensuring compliance with Cuban government directives;

b) Advising the Minister and the Governing Board of CUPET;

c) Establishing indicators to evaluate the results of the management of CUPET and its enterprises, thereby controlling CUPET's compliance with Cuban government directives;

d) Dictating CUPET's quarterly and annual performance;

e) Investigating business opportunities with foreign capital jointly with CUPET; and

f) Directing, coordinating, executing and controlling CUPET's compliance with the Cuban government's approved policy for the sustainable development of the Cuban oil and gas sector.

62. Not only does the Cuban government control CUPET's operations, but it also dictates the uses of CUPET's profits, including the taxes to be paid and the distribution and uses of the remaining profits. Furthermore, the Cuban government uses CUPET to subsidize operations of other state-owned enterprises, which are assigned quotas of gasoline for their vehicles by the Cuban Ministry of Economy and Planning, and which receive prepaid gas cards

issued by Financiera Cimex S.A.[1] In this way, the Cuban government diverts profits from gasoline sales to subsidize the gasoline consumption of various state-owned enterprises.

63. CUPET is thus totally controlled and dominated by the Cuban state and operated for the benefit of the Cuban government.

64. Accordingly, the Cuban state maintains ultimate control over Energas. UNE and CUPET, both state-owned entities, have majority ownership (66%) of Energas. Thus, the ultimate decision-maker for Energas is Cuba, and, more specifically, the Ministry of Energy and Mines. Energas is also intimately tied with Cuba—it supplies 8-10% of Cuba's electricity, its first plant was established by the Cuban government, and it processes natural gas it receives free of charge from CUPET. Energas is effectively controlled by Cuba.

65. Though Defendants are legally separate from Cuba in some respects, the Cuban government exercises extensive control over both Defendants such that each are alter egos of the Cuban state. *See Helmerich & Payne*, 153 F.4th at 1329–30.

## VI. Defendants' Trafficking Activities Harm Plaintiff

66. Congress explicitly found that the trafficking activities alleged herein are directed at and cause injury in the United States, including in Plaintiff's home state of Florida. Specifically, Congress found that trafficking (i) poses a national security threat to the United States by supporting the Castro regime, (ii) undermines U.S. foreign policy, (iii) jeopardizes the rightful claims of U.S. nationals, (iv) impedes the ability of the U.S. government to return confiscated

[1] Financiera Cimex, S.A. (FINCIMEX Panama) was originally created and registered in the Republic of Panama by Public Deed (Escritura Publica) No. 474 of January 24, 1984 and later created as a Cuban *sociedad anonima* (FINCIMEX Cuba) by Public Deed (Escritura Publica) No. 172 of May 15, 1995.

property to the rightful owners, and (v) undermines the "free flow of commerce." *See* 22 U.S.C. §§ 6021, 6022, 6081.

67. Defendants' unlawful trafficking harms Plaintiff, a United States national and Florida cooperation, in precisely the manner Congress identified when creating the Helms-Burton cause of action. Defendants' conduct deprives Plaintiff of the use, value and economic benefit of the Confiscated Property, *see* 22 U.S.C. § 6081(8), and Defendants did not obtain Plaintiff's authorization before doing so, *see* 22 U.S.C. § 6023(13)(A).

68. Plaintiff's investigation is ongoing, and Plaintiff reasonably believes that discovery is likely to reveal additional trafficking and commercial activities conducted by Defendants or their agents that further injured Plaintiff and generated revenue or other benefits from the Confiscated Property.

## VII. Defendants are Trafficking in the Confiscated Property

### A. Defendants are Trafficking in Plaintiff's Power Generation Assets

69. As set forth in the FCSC certified claim, Cuba expropriated energy infrastructure that generated and transmitted power to 90% of Cuba, which continues to be exploited by Defendants to this day. This infrastructure was divided into two electricity systems: the "Western System" and the "Eastern System."

70. The "Western System" is centered in Havana. This system includes nine generating stations, as well as substations at Naranjito, Colon, Diezmero, Principe, Rincon, San Augustin, Santa Clara, and Tropical. The nine generating stations are:

a. Consolidated Steam Electric Station, which is on Havana Bay;

b. Regla Steam Electric Station, which is in the community of Regla;

c. Rincón de Melones Steam-Diesel Electric Station, which is on Havana Bay;

d. Matanzas Steam Electric Station, which is on Matanzas Bay;

e. O'Bourke Steam Electric Station, which is on Cienfuegos Bay;

f. Cienfuegos Steam Electric Station, which is in the City of Cienfuegos;

g. Ciego de Avila Diesel Electric Station, which is 60 miles west of Camaguey;

h. Vicente Steam Electric Station, which is six miles east of Ciego de Avila; and

i. Camaguey Steam Electric Station at Camaguey.

71. The "Eastern System" includes three generating stations, which are:

a. Santiago Steam Electric Station on Santiago Bay;

b. Manzanilla Diesel Electric Station 100 miles west of Santiago; and

c. Guaso Hydro Electric Station 50 miles northeast of Santiago.

72. Defendants either individually or collectively have and continue to own, control, manage, and otherwise commercially benefit from both systems, including profiting through the Energas joint venture. For example, Defendants continue to exploit and commercially benefit from at least the following critical parts of both systems:

a) ***Plaintiff's former Consolidated Steam Electric Station on Havana Bay***. The facility was and continues to be referred to as "Tallapiedra." The facility continues to serve as a critical component of Havana's electrical infrastructure, including housing a major substation and the base of an underground distribution network serving Old Havana.

b) ***Plaintiff's former Regla Steam Electric Station on the eastern shore of Havana Bay***. The facility currently is a strategic energy facility for UNE, which serves as the mooring location for one of the floating power-generation vessels used to supply electricity to Cuba's national grid via the Confiscated Property.

c) ***Plaintiff's former Rincón de Melones Steam-Diesel Electric Station***. The station today serves as the Melones electrical substation and associated gas-production facilities. The Melones substation remains an active and important transmission node within Cuba's electrical network and is used to interconnect generating resources supplying power to the national grid. In addition, state-operated gas-production facilities located on the site continue to distribute manufactured gas supplied by Energas to substantial portions of Havana.

d) ***Plaintiff's former O'Bourke Steam Electric Station on Cienfuegos Bay***. The facility now operates as the Carlos Manuel de Céspedes Thermoelectric Power Plant, one of Cuba's principal power-generation facilities. The current plant occupies the same parcel and site as Plaintiff's former generating station and continues to generate electricity for the national grid.

e) ***Plaintiff's former Santiago Steam Electric Station on Santiago Bay***. The site now forms part of the Antonio Maceo Thermoelectric Power Plant, commonly known as "Renté," one of eastern Cuba's principal generation complexes. UNE continues to operate and maintain power-generation facilities on the confiscated property.

f) ***Plaintiff's former Guaso Hydro Electric Station near Guantánamo***. The facility remains operational, synchronized with Cuba's national electric grid, and is used by UNE's hydroelectric division to generate and distribute electricity.

73. Defendants either individually or collectively have and continue to own, control, manage, and otherwise commercially benefit from CEC's Havana Gas System, including

profiting through the Energas joint venture. At the time of confiscation, the system consisted of generating facilities, storage facilities, booster stations, hundreds of miles of distribution mains, and tens of thousands of customer connections. The system remains in operation through the participation of Energas and Cuban state-owned successor entities and continues to provide gas service to hundreds of thousands of customers in Havana and surrounding areas. As recently as July 27, 2026, reporting from the New York Times indicates that approximately 280,000 residences in Havana have such gas lines.

74. Defendants either individually or collectively have and continue to own, control, manage, and otherwise commercially benefit from other assets encompassing "land, buildings, machinery, vehicles, equipment and construction work in progress" at the time of the expropriation. Ex. 1 at 4–5. For example, Defendants continue to exploit and commercially benefit from at least:

a) ***Plaintiff's former Capdevila Service Center in Boyeros, Havana***. Prior to confiscation, the property served as Plaintiff's administrative, maintenance, warehouse, and service complex. Today, the facility functions as the headquarters of Empresa Eléctrica La Habana and is used to administer, manage, and commercialize electrical generation, transmission, and distribution services throughout Havana. UNE's continued possession and use of the property provides direct operational and economic benefits derived from Plaintiff's confiscated assets.

b) ***Plaintiff's former transmission and distribution network.*** This network consisted of thousands of miles of electrical lines and associated infrastructure. Following confiscation, this network became the foundation

and backbone of Cuba's Sistema Eléctrico Nacional ("SEN"), the national electrical grid. Defendants' operation and commercialization of the SEN depend upon and derive value from the confiscated network and associated assets originally developed and owned by Plaintiff.

75. Through the operation of the facilities and infrastructure described above, Defendants knowingly use, control, manage, lease, profit from, and otherwise commercially exploit Plaintiff's Confiscated Property. Such conduct constitutes trafficking within the meaning of 22 U.S.C. § 6023(13).

76. Energas' power-generation and gas-processing operations depend upon and are physically integrated with facilities, transmission infrastructure, and gas-distribution assets confiscated from CEC.

77. Moreover, Energas knowingly traffics in Plaintiff's Confiscated Property through its joint venture with UNE and its participation in Cuba's power-generation and natural gas processing sectors. Energas utilizes, benefits from, and derives commercial value from infrastructure that is integrated into and dependent upon Plaintiff's confiscated generation, transmission, distribution, and fuel-supply assets. Energas' operations would not be possible absent its use of, access to, and commercial benefit from confiscated property and facilities controlled by UNE and other Cuban instrumentalities.

78. Defendants' trafficking in the power generation assets is ongoing and continuous. Defendants have knowingly engaged in such conduct for years after the effective date of Title III of the Act and continue to derive substantial commercial benefits from Plaintiff's Confiscated Property without Plaintiff's authorization and without compensation.

**B. Defendants are Trafficking in Plaintiff's "Current Assets" and "Investments in Cuba"**

79. The Cuban government also took possession and control of other assets such as cash, investments, and debits, as the FCSC certified. Those assets, like Plaintiff's power generation assets, have not been returned to Plaintiff, and Plaintiff has not received compensation for their loss. These assets, including $3.5 million in materials and supplies, were necessary for the functioning of CEC's business. Given that each of these assets were necessarily part of the operation of Cuba's nationalized gas and electricity monopoly pre-1960, which is now operated by Defendants, upon information and belief, Defendants continue to traffic in these assets.

80. The FCSC also found that Cuba took control of Plaintiff's current assets at the time of the expropriation on August 6, 1960. These assets include:

a) Cash ($1,075,757.00)

b) Special Deposits ($7,348.00)

c) Working Funds ($593,914.00)

d) Accounts Receivable

   i. General ($7,425,270.00)

   ii. Municipal & Other Government ($15,252,197.00)

   iii. Miscellaneous ($1,812,197.00)

e) Interest & Dividends Receivable ($2,530.00)

f) Materials & Supplies ($3,545,473.00)

g) Prepayments ($529,397.00)

81. Another category of loss certified in the FCSC Certified Claim is related to Plaintiff's "investments in Cuba." Ex. 1 at 5.

82. The following CEC investments were expropriated by Cuba:

a) Vedado Tennis Club Mortgage Bonds ($5,000.00)

b) Country Club de Santiago Stock ($500.00)

c) Camaguey Country Club Bonds ($500.00)

d) Compania de Publicacion "El Dia" Bonds ($5,000.00)

e) City of Matanzas - 8% Gold Bonds ($3,954.55)

f) Julio Cesar Hidalgo & Cia. Stock ($100.00)

g) Havana Biltmore Yacht & Country Club Series A Stock ($2,000.00)

h) Gremio de Obreros y Mareantes - Advances ($10.00)

i) Acueducto de Santa Maria - Debt ($371.84)

j) Autobuses Modelo, S.A. - Preferred Shares ($72,000.00)

k) Cooperativa de Repartos Electricos - Advances ($122,094.26)

l) Ministerio de Communicaciones - Bandes Bonds ($1,000.00)

m) Advances to Employees ($789,519.00)

n) Ferrocarriles Occidentales de Cuba Stock Series B ($102,400.00)

o) Land, "La Puntilla"[2] ($100,101.45)

p) Cia. Inmobiliaria "La Torre, S.A." Stock ($4,000.00)

q) Ministerio de Educacion, Bonds ($12,500.00)

r) Veteranos, Tribunales y Obras 4% Bonds ($89,500.00)

s) Bandes 4%, Total Bonds ($112,500.00)

t) Compania Financiera de Transporte - Debt ($144,000.00)

---

[2] The land referred to as La Puntilla is a parcel of land located in Marianao, Cuba with an area of 6,160.90 square meters. The land was conveyed from the Havana & Insular Real Estate Company to Edward L. Kanter on October 7, 1954 for the sum of $214,000.00 for the benefit of Cuban Electric Company (which owns 46.77638%) and American & Foreign Power Company, Inc. (which owns 53.22362%). CEC has a certified claim for $100,101.45 and Boise Cascade Corporation has a certified claim for $113,898.55 (*see* FCSC Claim No. CU-3548, Decision No. CU-3866 (Oct. 1, 1969)) for the confiscation of the land referred to as La Puntilla.

83. The FCSC found that the Cuban Government took possession and control of all of the above-listed investments and that CEC was the rightful owner of these assets.

84. Finally, based on its review of the record, the FCSC valued Plaintiff's deferred debits, including "unamortized expenses incurred in connection with debt and stock issues for the printing of indentures, engraving, notarial and registration fees in Cuba and Cuban revenue stamps," at $2,364,413.00. Ex. 1 at 7.

85. Defendants' trafficking in these other assets is ongoing and continuous. Defendants have knowingly engaged in such conduct for years after the effective date of Title III of the Act and continue to derive substantial commercial benefits from Plaintiff's Confiscated Property without Plaintiff's authorization and without compensation.

**COUNT I – TRAFFICKING IN CONFISCATED PROPERTY**
**(as against all Defendants)**
**(22 U.S.C. § 6082)**

86. Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

87. Plaintiff is a U.S. national and owns the claim to property that was confiscated by the Cuban Government after January 1, 1959 (*i.e.*, the Confiscated Property). The claim is certified and is attached as Exhibit 1.

88. UNE is a person under the Act, as defined by 22 U.S.C. § 6023(11).

89. Energas is a person under the Act, as defined by 22 U.S.C. § 6023(11).

90. Based on the facts alleged herein and on information and belief, Defendants have trafficked and continue to traffic in the Confiscated Property in violation of Title III of the Act.

91. Based on the facts alleged herein, Defendants have knowingly and intentionally trafficked in the Confiscated Property by:

a. obtaining control of, managing, using, and holding interests in the Confiscated Property;

b. engaging in commercial activities using and benefiting from the Confiscated Property, including the generation, transmission, distribution, and sale of electricity and gas; and

c. causing, directing, participating in, and profiting from trafficking by others through the Energas joint venture and related commercial arrangements.

92. At all relevant times, Defendants have conducted this trafficking "without the authorization of any United States national who holds a claim to the property" (22 U.S.C. § 6023(13)) in violation of Title III of the Act.

93. Defendants have engaged in unlawful trafficking after November 1, 1996, the end of the 3-month grace period after the Act became effective on August 1, 1996.

94. Because Plaintiff holds a certified claim, it is not required to give notice under 22 U.S.C. § 6082(a)(3).

95. Therefore, Plaintiff is entitled to damages in the amount of the certified claim, plus pre-judgment interest at the rate of 6% per annum awarded by the FCSC.

96. Plaintiff also is entitled to treble damages, statutory interest pursuant to 22 U.S.C. § 6082(a)(1)(B), attorney's fees, costs, and post-judgment interest.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered in its favor and against Defendants:

a. Awarding Plaintiff actual damages in the amount of $267,568,413.62;

b. Awarding Plaintiff pre-judgment interest at the rate of 6% per annum from August 6, 1960, as set forth in the FCSC's award;

c. Awarding Plaintiff treble damages pursuant to 22 U.S.C. § 6082(a)(3);

d. Ordering Defendants to pay Plaintiff's reasonable attorney's fees and costs incurred in this action pursuant to 22 U.S.C. § 6082(a);

e. Awarding Plaintiff statutory interest pursuant to 22 U.S.C. § 6082(a)(1)(B) and post-judgment interest; and

f. Granting all other relief at law or in equity that the Court deems just and proper.

Date: July 29, 2026

Respectfully submitted,

By: /s/ *Steven K. Davidson*

Steven K. Davidson (DC Bar #407137)
sdavidson@steptoe.com
Michael J. Baratz (DC Bar #480607)
mbaratz@steptoe.com
Emma Marshak (DC Bar #1048357)
emarshak@steptoe.com
STEPTOE LLP
1330 Connecticut Ave NW
Washington, DC 20036
Telephone: 202-429-3000
Facsimile: 202-429-3902

Michael Scavelli (*pro hac* forthcoming)
mscavelli@steptoe.com
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
Telephone: 212-506-3900

*Counsel for Plaintiff*